UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                      :

WEILIAN SHEN, *a/k/a Wei Lian Shen, a/k/a Gao*  :
*Ai Wei, a/k/a "Ah Wei,"*                           :
                                                      :

                            Petitioner,  :

                                                        :

                    -against-           :

UNITED STATES OF AMERICA,         :
                                                      :

                     Respondent.  :
-------------------------------------------------------------- X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 4/25/2024 |

1:22-cv-8014-GHW
1:4-cr-1205-23-BSJ

MEMORANDUM
OPINION & ORDER

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Petitioner Weilian Shen came to the United States illegally in 1998.  In 2006, Ms. Shen

pleaded guilty to two federal counterfeiting offenses.  Later that year, she was sentenced to

approximately 19 months in prison.  Her conviction and sentence made her an "aggravated felon"—

subject to mandatory removal, and ineligible for asylum in the United States.  After discovering that

her felony conviction would render her ineligible for asylum, Ms. Shen filed this petition for the

issuance of a writ of error *coram nobis* to vacate her conviction.  Ms. Shen asserted that her defense

counsel had failed to advise her of the immigration consequences of her plea, and that he implied

that she would be able to stay in the United States following her conviction.  The United States

contested her account of events.  In a prior opinion, the Court held that an evidentiary hearing was

required to figure out what happened.

The Court held that evidentiary hearing in February 2024.  The Court heard testimony from

Ms. Shen and her former counsel.  The court does not credit Ms. Shen's account:  it is self-serving,

internally contradictory, and inconsistent with the transcript of the plea proceeding.  Because the

facts do not support Ms. Shen's claim, her petition is denied.

## II.    PROCEDURAL HISTORY

Ms. Shen initiated this action seeking the issuance of a writ of *coram nobis* to vacate her conviction on September 20, 2022.  Dkt. No. 1.  On September 21, 2022, she filed an amended petition, which is at issue here.  Dkt. No. 5 (the "Petition").

In her Petition, Ms. Shen argued that the writ should issue because she received ineffective assistance of counsel from her lawyer, Joseph C. Schioppi.  In particular, she asserted that Mr. Schioppi's representation was deficient because he provided her with no advice about the immigration consequences of her plea.  Moreover, according to Ms. Shen, he gave her affirmatively inaccurate advice when he advised her that the sooner she pleaded guilty, the sooner she would be able to return home to see her daughter.  Because she was accepting a plea to an aggravated felony, she suggests, she should have been informed at the time that "deportation today is an essentially certain, automatic, and unavoidable consequence of an alien's conviction for an aggravated felony." *United States v. Couto*, 311 F.3d 179, 189–90 (2d Cir. 2002).  Ms. Shen also argued that had she known of the immigration consequences of her plea, and the likelihood of her deportation and separation from her daughter, she would not have accepted the plea.

Because Ms. Shen raised issues regarding the nature of the advice provided to her by Mr. Schioppi, the Court requested that Ms. Shen waive her attorney-client privilege with respect to the substantive communications between her and Ms. Schioppi.  Dkt. No. 17.  Ms. Shen waived her attorney-client privilege on November 15, 2022.  Dkt. No. 18.

The Government filed its opposition to the Petition on December 15, 2022.  Dkt. No. 19 ("Opp.").  The Government supported its opposition with a declaration by Mr. Schioppi with respect to the communications that he had with Ms. Shen regarding the immigration consequences of her plea, as detailed above.  In its opposition, the Government argued first that Ms. Shen's Petition failed to demonstrate that Mr. Schioppi's performance was deficient.  Opp. at 8–12.  This

argument rested in part on the Government's contention that the Court should credit Mr. Schioppi's recollection of the advice that he likely provided to Ms. Shen—namely that he likely advised her that her guilty plea "may and likely would result in adverse immigration consequences"—rather than Ms. Shen's version of events—that he provided no immigration advice to her at all prior to her plea. *Id.* at 9–10.  The Government argued that the advice that Mr. Schioppi asserted he had likely provided would have been reasonable at the time of Ms. Shen's plea.  That is because, the Government argued, the Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. 356 (2010), establishing that criminal defense attorneys have an affirmative obligation to advise a client of the immigration consequences of a plea and conviction, did not apply at the time of Ms. Shen's plea.  *Id.* at 9–10.

The Government also argued in its opposition that Ms. Shen was not prejudiced by any deficient counsel provided by Mr. Schioppi.  Here too, the Government asked the Court to rest its determination in part on a finding of fact.  The Government asserted that Ms. Shen's "own sworn statements from the plea hearing contradict her current claim that she did not understand the potential immigration consequences of her guilty plea."  *Id.* at 15.

And, finally, the Government argued that Ms. Shen's Petition was not filed timely.  The Government argued that "the record belies" Ms. Shen's assertion that she did not realize until shortly before she filed her Petition that her conviction would prevent her from regularizing her immigration status.  *Id.* at 16–17.  The Government contended that the record supported the conclusion that Ms. Shen was aware of the issue well before then.  The Government argued that the proper benchmark should be the date of her 2006 plea, or, alternatively, the date on which Ms. Shen applied for asylum in 2018.  *Id.* at 16.  If those were the benchmark dates, the Government argued, Ms. Shen's 2022 filing came too late.

The Court issued an order and opinion regarding the Petition on August 3, 2023.  Dkt. No. 23 (the "August Opinion").  In the August Opinion, the Court evaluated the facts presented in the

parties' submissions and concluded that disputed issues of fact prevented the Court from ruling on Petition. The Court ordered an evidentiary hearing so that the parties could present the facts supporting their respective positions. Dkt. No. 26. In advance of the hearing, the Court made clear to the parties that it expected that "each of the parties will present to the Court during the hearing all of the evidence that they believe to be relevant to the resolution of the petition." Dkt. No. 35.

## III.   FINDINGS OF FACT

The Court held the evidentiary hearing on February 14, 2024. Ms. Shen's counsel called one witness—Ms. Shen. Ms. Shen testified with the assistance of an interpreter. The Government called Ms. Shen's former counsel, Mr. Schioppi. The parties also stipulated to the admission of the exhibits to the Petition. February 14, 2024 Hearing Transcript ("Tr.") at 12:5–16. These are the Court's findings of fact.

### A.   Ms. Shen Is Arrested and Detained

Ms. Shen is a Chinese national. She emigrated to the United States illegally in October 1996. She does not have legal status in the United States.

On November 10, 2004, a grand jury indicted Ms. Shen along with 27 other defendants in a sweeping indictment. Many of the defendants were charged as members of a racketeering conspiracy that had as objects attempted murder and extortion, among other crimes. Petition Ex. B. Ms. Shen was charged only in Counts Five and Six of the indictment. Those counts charged her with trafficking in counterfeit goods and conspiracy to traffic in such goods in violation of 18 U.S.C. § 371 and § 2320. Petition Ex. B at 21–24.

On November 11, 2004, Ms. Shen was arrested on the charges. *See U.S. v. Shang et al.*, 1:04-cr-1205-BSJ. Ms. Shen hired Mr. Schioppi, retained counsel, who represented her throughout the proceedings following her arraignment. Ms. Shen was arraigned on November 12, 2004. Ms. Shen

was detained on consent that day and remained in custody until her sentencing nearly 19 months later.

### B.   Advice Provided to Ms. Shen Before Her Guilty Plea

At the evidentiary hearing, the Court was confronted with different accounts of the central factual issue:  what advice did Ms. Shen receive regarding the possible immigration consequences of her guilty plea?  The competing narratives are short.  Therefore, the Court begins with a Rashomon-like exposition of each.

### 1.   Ms. Shen's Account

Ms. Shen testified that she met with Mr. Schioppi only "[m]aybe once or twice." Tr. at 14:8. According to her, Mr. Schioppi never brought an interpreter to a meeting with her.  Ms. Shen testified that she did not understand what Mr. Schioppi said to her "at all." Tr. 16:23.  She testified that she learned phrases in English to communicate with him by speaking with other "Chinese people at that institute." *Id.* at 16:25–17:3.  She testified that she explained to them that she missed her daughter and asked them to teach her how to communicate that concept to her lawyer in English. *Id.*

According to Ms. Shen, the meeting with Mr. Schioppi was very brief and her lawyer "just talked to me very simply, if you do this, what will happen . . . ." *Id.* at 14:18–19.  The only thing that she remembered him telling her was that "if I pleaded guilty, then I will be able to go home to see my child." *Id.* at 14:22–23.  Ms. Shen testified that notwithstanding her lack of understanding of English, Mr. Schioppi was able to communicate that to her in a way that she understood.  *Id.* at 19:10–13 ("Q:  And did he tell you this in simple English such that you could understand?  A:  Yeah. It's, like, daughter, baby, like, the hugging, you know, the simplest form.").  Ms. Shen testified that she "did not learn anything" from her counsel about her crime.  *Id.* at 17:9–11.

5

Ms. Shen testified that her lawyer told her nothing about the immigration consequences of her guilty plea.  Instead, she testified that she was wholly unaware of the fact that her plea rendered her deportable until August 2022, when her immigration lawyer told her that was the case.  Ms. Shen remembered nothing else about the substance of any meetings with Mr. Schioppi or his advice to her.

Ms. Shen testified that after her guilty plea, she had a brief interaction with Mr. Schioppi.  She was waiting in a small room.  Mr. Schioppi came in and said "I don't know how long you have to wait here.  I don't know if immigration will take you away, so I cannot wait here."  *Id.* at 15:2–4.  "Then he left."  *Id.* at 15:4.

### 2.     Mr. Schioppi's Account

Mr. Schioppi testified that he has been a practicing attorney since 1974.  His primary area of practice is criminal defense.  He has represented about 1,000 people over the course of his years in practice; 40-50% of those cases involved people who were not citizens of the United States.

Mr. Schioppi testified that he had no specific recollection of Ms. Shen's case.  So, instead, he testified about his customary practices at the time that he represented Ms. Shen.  He testified that it was his practice to have an interpreter present with him during his meetings with clients who did not speak English.  As to his customary advice to clients who are not citizens before a guilty plea, Mr. Schioppi testified as follows:  "General practice would be, if a person is not a United States citizen, advise them that any conviction or plea will have immigration ramifications, which could include deportation."  *Id.* at 27:19–22.[1]  Mr. Schioppi testified that he provided this advice to his clients who were not citizens, regardless of the nature of the offense.

---

[1] Mr. Schioppi testified to a variant of this wording later during the proceeding:  "In general, I would tell them that any conviction could and would result in immigration consequences which could include and would include deportation."  Tr. 31:9–11.

6

### 3.      The Plea Transcript

There is one other source of information about the advice that Mr. Schioppi provided to Ms.

Shen, the transcript of her guilty plea.  Unlike the memories of Ms. Shen and Mr. Schioppi, it is fixed

and unfaded.

Ms. Shen pleaded guilty to the offense on April 26, 2006 before the Honorable Henry B.

Pitman.  She was represented by Mr. Schioppi.  An interpreter translated the proceedings into

Mandarin for Ms. Shen.[2]  Because Judge Pitman was a magistrate judge, the first order of business

was to obtain Ms. Shen's consent for him to accept her plea.  Judge Pitman showed her the waiver

form.  He asked her the following questions about it:

> THE COURT:  Was that document translated for you into Mandarin before you
> signed it?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Did you discuss it with your attorney before you signed it?
>
> THE DEFENDANT:  Yes.  It's been discussed.

Petition Exhibit D, Dkt. No. 2-1 ("Plea Tr."), at 3:11–15.

Then Judge Pitman engaged in the following colloquy with Ms. Shen regarding her plea

agreement:

> THE COURT: : There is a second document before you that bears a blue tag that
> says Court Exhibit 1.  Do you see Court Exhibit 1?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Does your signature appear on the last page of Court Exhibit 1?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Was Court Exhibit 1 translated for you into Mandarin before you
> signed it?

---

[2] Ms. Shen confirmed that she understood everything that the interpreter said to her during the hearing.  Plea Tr. at
28:17–29:1.

THE DEFENDANT:  Yes.

THE COURT:  Did you discuss Court Exhibit 1 with your attorney before you signed it?

THE DEFENDANT:  Yes.

THE COURT:  And is Court Exhibit 1 an agreement with the government pursuant to which you're offering your plea today?

THE DEFENDANT:  Yes.

*Id.* at 4:8–23.[3]

Ms. Shen was then placed under oath.  Judge Pitman engaged in an extended colloquy with her to ensure that she was competent and that her plea was knowing and voluntary.  Judge Pitman asked Mr. Schioppi how many times he had visited with Ms. Shen before the plea hearing.  Mr. Schioppi described "several" conversations with Ms. Shen, and that, as a result, he was confident that she understood the proceedings.

THE COURT:  But am I correct in my assumption that you've spoken with Ms. Shen on several occasions before today?  Is that correct?

MR. SCHIOPPI:  That is correct, your Honor.

THE COURT:  And based on those conversations, is it clear to you that she understands the nature of her situation and understands the nature of the proceedings today?

MR. SCHIOPPI:  Yes.

---

[3] Neither the defendant nor the United States provided the Court a copy of the defendant's plea agreement notwithstanding the fact that it was marked as an exhibit during the guilty plea proceeding, the transcript of which was provided to the Court.  Plea agreements are generally relatively complex documents that describe the nature of the plea, the agreements of the parties, and describe rights that are waived by the defendant.  In 2024, plea agreements in the Southern District of New York customarily contain language regarding the potential immigration effects of a plea, but the Court does not know whether there was language advising Ms. Shen of the possible immigration consequences of her plea in the plea agreement.  For purposes of this opinion, the Court assumes that there was no such language in Ms. Shen's plea agreement.

*Id.* at 8:4–11.  Ms. Shen affirmed that, like her plea agreement, the indictment had been translated

for her.  *Id.* at 8:16–18.  She told Judge Pitman that she was satisfied with Mr. Schioppi's

representation of her.  *Id.* at 8:22–25.

Judge Pitman carefully reviewed Ms. Shen's understanding of the nature and consequences

of her plea.  She properly answered each of the questions.  The transcript does not reflect that Ms.

Shen had difficulty with the substantive issues raised by the Court, indicating to the Court that she

had discussed the issues in advance with her counsel, consistent with Mr. Schioppi's representations

to Judge Pitman.  And Ms. Shen expressly stated that she had discussed the advisory sentencing

guidelines with her counsel.  *Id.* at 12:21–23 ("THE COURT:  Have you and you attorney discussed

how the guidelines might apply in your case?  THE DEFENDANT:  Yes.").

Judge Pitman asked Ms. Shen if she was aware of the potential immigration consequences of

her plea in the following exchange:

> THE COURT:  Ms. Shen, a guilty plea can also have immigration consequences for
> individuals who are not citizens of the United States, and because of them, let me ask
> you:  Are you a citizen of the United States?
>
> THE DEFENDANT:  No.
>
> THE COURT:  Do you understand that one of the other consequences, one of the
> additional consequences of your guilty plea is that you may be deported or removed
> from the United States, and you may be prohibited from ever reentering the United
> States?  Do you understand that's another consequence of your guilty plea?
>
> THE DEFENDANT:  Yes.

*Id.* at 17:22–18:9.

Later during the proceeding, the court and counsel engaged in a colloquy about whether Ms.

Shen could allocute to one of the overt acts described in the indictment.  The Court asked Mr.

Schioppi whether she could allocute to one of them.  Mr. Schioppi did not have the indictment in

front of him, but, without first conferring with Ms. Shen, he told the Court that she could do so.  *Id.*

at 23:12–15 ("THE COURT:  Is there a particular over act or several overt acts that Ms. Shen can

allocute to?  MR. SCHIOPPI:  I believe she can allocute to several, if I may, Judge.").

After engaging in a careful and thorough plea colloquy with Ms. Shen, Judge Pitman

accepted her plea.  He recommended that District Judge Barbara Jones accept the plea and he

scheduled a sentencing proceeding before Judge Jones in June 2006.

### 4.    The Court's Findings

The Court does not credit Ms. Shen's testimony that she did not receive advice about the

immigration consequences of her plea.  Instead, the Court finds that Mr. Schioppi advised her that

there would be immigration consequences as a result of her plea and that those immigration

consequences could include deportation.  The Court also does not credit Ms. Shen's testimony that

Mr. Schioppi told her "if I pleaded guilty, then I will be able to go home to see my child."

There are many reasons why the Court finds Ms. Shen's testimony to not be worthy of

belief.  First, the Court observed her demeanor during her testimony and did not find her credible.

Second, Ms. Shen has a clear motivation to fabricate her account of events.  She wants to obtain

lawful permanent residence in this country.  Her conviction bars that result, and makes her subject

to deportation to China, a country where, she claims, she may experience religious persecution.  Ms.

Shen has reason to believe that the only way to achieve her desired goal is to have her conviction

overturned as a result of her Petition.

Third, Ms. Shen's account is refuted by the transcript of her plea proceeding.  Recall that Ms.

Shen testified that she met with her counsel just once or twice, that the meetings were brief, that she

did not have the benefit of an interpreter, that she understood almost nothing of what he said, and

that she learned nothing from her counsel about her crime.  Despite that purported lack of

comprehension, she remembers specifically that he did not provide her with advice about the

immigration consequences of her plea.  She remembers just one statement made by her lawyer.  She

testifies that that she remembers the precise language that he used—that she would be returned "home" to be with her daughter after her conviction and sentencing.

Beginning with the number of meetings between Mr. Schioppi and Ms. Shen, the plea hearing transcript establishes that Ms. Shen and Mr. Schioppi met more frequently than Ms. Shen represented.  Mr. Schioppi stated that he met with his client "several" times—more than just the "maybe" once or twice that Ms. Shen testified to.  The remainder of the plea transcript evinces that Ms. Shen was familiar with the indictment, her plea agreement and the guilty plea process as a whole.  It also shows that Mr. Schioppi was aware of the extent of Ms. Shen's involvement in the offense—including, as described above, as to which overt acts she could be expected to allocute.  This is more consistent with multiple substantive meetings than one or two "brief" meetings, as Ms. Shen asserts.

The plea transcript also puts the lie to Ms. Shen's assertion that there was no interpreter present in any of her meetings with Mr. Schioppi.  During the plea proceeding, Ms. Shen confirmed that both her plea agreement and the indictment had been translated for her before the guilty plea hearing.  She said that she had discussed the plea agreement and other complex issues with Mr. Schioppi, including the application of the advisory sentencing guidelines to her case.  Her other statements during the hearing reflected an understanding of the plea process.  This is consistent with Mr. Schioppi's testimony that he used an interpreter when he met with clients who did not speak English.  The Court does not believe Ms. Shen's testimony that Mr. Schioppi did not use an interpreter during his meetings with her.  Her testimony at the evidentiary hearing is flatly inconsistent with her sworn statements during the guilty plea proceeding.

That Mr. Schioppi and Ms. Shen were able to talk about issues substantively during their meetings is also confirmed by the plea transcript.  The plea transcript shows that Ms. Shen was familiar with the plea process generally, and the consequences of her plea—including the possible

immigration consequences of her plea.  This contradicts Ms. Shen's assertion that the only information that Mr. Schioppi conveyed to her was that if she pleaded guilty she would be able to go home to see her daughter.  As described above, Ms. Shen testified at the plea hearing that she had discussed her plea agreement and other substantive issues with Mr. Schioppi, and that she was satisfied with his representation of her.  She responded appropriately to all of the oft-complex questions presented to her by Judge Pitman, from which the Court infers that she was prepared for the plea proceeding.  Mr. Schioppi affirmed that she understood of the nature of the proceeding.  The transcript of the plea hearing contradicts Ms. Shen's current version of events.

The fourth reason why the Court finds Ms. Shen's testimony to be incredible is that the testimony is self-serving and internally inconsistent.  To begin, Ms. Shen's testimony that she remembers that Mr. Schioppi did not advise her of the immigration consequences of her plea—a core predicate for her petition—is implausible.  The testimony raises these two fundamental questions:  If, as she testified at the evidentiary hearing, Ms. Shen did not understand what Mr. Schioppi was saying while he met with her, how can she be certain that Mr. Schioppi said nothing regarding the immigration consequences of her plea?  Why, given Ms. Shen's limited recollection of her interactions with her counsel after 18 years, is this memory of something that purportedly did *not* happen so clear?  The best answer to these questions, the Court believes, is that this part of Ms. Shen's testimony is not true.[4]

The transcript of the plea hearing supports the Court's finding.  Judge Pitman asked Ms. Shen a question about the immigration consequences of her plea.  Ms. Shen responded that she was

---

[4] There are some inconsistencies in Ms. Shen's description of her ability to understand English in her interactions with her counsel.  She testified that she didn't understand him "at all" and that she was able to communicate about her desire to see her daughter after learning English phrases from other Chinese inmates.  She described her communication with Mr. Schioppi about that as relying on very simple language and gestures.  But she recounted precisely what Mr. Schioppi allegedly said to her about immigration during what was described as a rushed meeting following her sentencing—signaling that she understood what he was saying clearly enough.  On redirect, Ms. Shen's counsel addressed that inconsistency—and directed her to explain better how it was that she was able to understand those statements.

aware of the consequences that he described.  There is no evidence in the plea transcript that she discussed the issue with her counsel before she responded to the question.  Her affirmative response indicates that she did know that there would be immigration consequences of her plea.  That is because, the Court finds, she learned that fact from her counsel beforehand.

Ms. Shen's comments during her sentencing hearing also reveal that she was aware of the prospect that her conviction could lead to adverse immigration consequences, including deportation. If, as she now claims, she was not aware of those possible consequences, she would have no reason to have told her sentencing judge "I hope your Honor will let me stay here to be with my daughter." Petition Ex. E ("Sentencing Tr.") at 3:25–4:1.

Similarly, the Court does not believe that Ms. Shen was told by Mr. Schioppi that if she pleaded guilty she "would be able *to go home* to see my child." Tr. at 14:22–23.  The language that Ms. Shen attributes to Mr. Schioppi is very important for this petition.  If Mr. Schioppi said that she would be able to return to her "home" (in the United States) to be with her daughter, the statement could reasonably be interpreted as a promise that she would be able to remain in the United States following her plea.  It is critical for Ms. Shen's Petition that she persuade the Court that Mr. Schioppi told her not merely that Ms. Shen would be reunited with her daughter somewhere in the world, but that she would return to her home in the United States to do so.  For many reasons, the Court does not credit Ms. Shen's testimony that he did so.

The testimony is self-serving and not credible.  It is simply too much of a coincidence that 18 years after her plea, Ms. Shen remembers only one piece of Mr. Schioppi's advice, that she remembers the exact language that he used in delivering that advice, and that the phrasing of the statement provides supports her Petition.  Ms. Shen's testimony about how this message was communicated does not support the conclusion that she remembered her counsel saying those specific words.  Ms. Shen used that language in her direct examination.  But following questioning

13

by the Court, Ms. Shen's counsel was unable to elicit the same testimony.  Tr. at 19:5–9 ("MR:
FIGUEROA-BRUSI:  Ma'am, you testified earlier that your attorney at the time told you that as
soon as you pleaded guilty, you would be released and could go home to your daughter, is that
correct?  A:  At the end of this case, you can, you know, reunite with your daughter.").

Ms. Shen's description of her communication with Mr. Schioppi undermines the credibility
of her purported recollection of the precise language that he used.  Ms. Shen testified that Ms.
Schioppi advised her about the fact that she could reunite with her daughter using gestures and
simple language.  Tr. at 19:12–13 ("It's, like daughter, baby, like, the hugging, the simplest form.").
She testified that her understanding of what her attorney told her was as follows:  "My
understanding was that I need to plead guilty in a hurry.  At the end of the case, I can return home."
Here she testifies that this was her understanding, not the words that she heard.

Ms. Shen has not proven that Mr. Schioppi advised her that she could return home if she
pleaded guilty.  The Court does not credit Ms. Shen's self-serving testimony that he expressly told
her that she would be permitted to return "home" to see her daughter, with the implicit promise that
she could expect to remain in the United States.  And given that Mr. Schioppi also advised her that
there would be immigration consequences of her plea that could include deportation, Ms. Shen has
not proven that Mr. Schioppi made any statement, explicit or implicit, to the effect that Ms. Shen
would be permitted to remain in the United States to be with her daughter.

Here too Ms. Shen's comments during her sentencing hearing reveal that she was aware of
the prospect that she would not be permitted to return home following her conviction.  Again, if she
did not understand that to be a risk, or if she credited a purported commitment by Mr. Schioppi that
she would be returned home, she would have no reason to implore the sentencing judge to let her
"stay here to be with my daughter."  Sentencing Tr. at 3:25–4:1.

The Court's finding that Mr. Schioppi did not tell Ms. Shen that she would return home after her conviction is consistent with the coda to her story that Ms. Shen offered at the evidentiary hearing.  According to Ms. Shen, Mr. Schioppi spoke with Ms. Shen shortly after her sentencing and told her that he did not know if she would be detained after the plea and that he could not wait around to find out.[5]  So Ms. Shen concedes that at that point in time she knew that she might be detained and deported as a result of her plea.  She did not express that she was shocked by the news.

In sum, the Court discredits Ms. Shen's testimony, and fully credits the testimony of Mr. Schioppi.  The Court concludes that Mr. Schioppi met several times with Ms. Shen prior to the plea with the assistance of an interpreter.  Over the course of those sessions, they discussed the nature of the crime charged against her and the details of her involvement in it.  They also discussed the substance of the indictment, her plea agreement, and the guilty plea process.  Mr. Schioppi advised Ms. Shen that her plea would have immigration consequences that could include deportation.  Mr. Schioppi did not tell Ms. Shen that she would be returned home to be reunited with her daughter, or otherwise imply that she could expect to remain in the United States following her conviction.

### C.       The Sentencing Hearing

Judge Jones sentenced Ms. Shen on June 23, 2006.  Ultimately, Judge Jones imposed a term of imprisonment of "time-served"—the approximately 19 months that Ms. Shen had been in prison since her arrest.  Sentencing Tr. at 4:20–5:10.  During the sentencing hearing, the Court and the defense engaged in the following colloquy touching on Ms. Shen's immigration status:

> THE COURT:  All right.  The guideline range in this range is 18 to 24 on a plea.  It's usually my practice, barring unusual circumstances, to go to the bottom of the guideline range.  And so I think honestly in this situation time served is the appropriate sentence.  However, let me ask you, Mr. Schioppi, if there's anything that you would like to say at this time with respect to the sentence at all?

---

[5] The account of this meeting was not included in the affidavit by Ms. Shen that her counsel submitted in support of the Petition.  *See generally* Shen Aff.  The omission from Ms. Shen's affidavit is perhaps not surprising, given that that these additional facts undermine Ms. Shen's claim that she was unaware of the immigration consequences of her plea in 2006.

MR. SCHIOPPI: I would concur with your Honor's estimation based on reviewing the report and the plea agreement in this case also, Judge. Basically, you're dealing with a 32-year-old woman here who's had no prior conflict with the law, and has a young child, six-and-a-half-year-old child. And she's expressed to me, and I know she's expressed to probation, that she hasn't been able to see her child for the last year and a-half or so because of her incarceration.

THE COURT: All right. Ms. Wei Lian Shen, is there anything that you would like to say to the Court before I pass sentence on you?

THE DEFENDANT: I hope your Honor will let me stay here to be with my daughter.

THE COURT: All right. I do not make decisions about whether or not people are permitted into the country or are allowed to stay in the country. My job right now is to sentence you for the two crimes that you pled guilty to, and I'm going to do that. I am going to give you time served, as I just mentioned, which means that that will finish your prison term. I do not know what will happen with respect to the immigration authorities. They will make their own decision. I don't know whether they will deport you or what will happen. So I can't give you any answer with respect to that. But at this time, let me pass sentence.

*Id.* at 3:5–4:13. Judge Jones later reiterated, "I do not know, as I said earlier, what will happen with the defendant with respect to the immigration authorities." *Id.* at 5:11–12.

Following completion of her sentence, Ms. Shen was not detained for further immigration proceedings notwithstanding her immigration status and the fact that she had been convicted of a so-called "aggravated felony." She was released.

Ms. Shen did not appeal her conviction and sentence, which fell within the anticipated sentencing guidelines range. Nor did she seek other collateral relief.

### D.    Asylum Application

In 2017, over ten years after her conviction, Ms. Shen asserts that she was introduced to Christianity by a friend. Petition Ex. A ("Shen Aff.") ¶ 8. Knowing that she had no legal status in the United States, and asserting that she feared religious persecution in China were she to be deported, Ms. Shen filed an application for asylum on January 23, 2018. *Id.* In August of 2022, while preparing for a preliminary hearing regarding her asylum application, Ms. Shen's attorneys

discovered that her conviction for counterfeiting constituted an "aggravated felony" as defined by the Immigration and Nationality Act. 8 U.S.C. §§ 1101(a)(43)(R) (defining an aggravated felony as one "relating to . . . counterfeiting . . . for which the term of imprisonment is at least one year . . . ."). Ms. Shen learned that her conviction renders her ineligible for asylum. Shen Aff. ¶ 9; *see* 8 U.S.C. §§ 1158(b)(2)(A)(ii), (b)(2)(B)(i).

At the preliminary hearing held on September 12, 2019, the presiding Immigration Judge noted that Shen's criminal history might present an obstacle to her asylum petition. Shen Aff. ¶ 9.

## IV.   LEGAL STANDARD

"The writ of *coram nobis* is an ancient common-law remedy designed 'to correct errors of fact.'" *United States v. Denedo*, 556 U.S. 904, 910 (2009) (quoting *United States v. Morgan*, 346 U.S. 502, 507 (1954)). "In federal courts the authority to grant a writ of *coram nobis* is conferred by the All Writs Act, which permits 'courts established by Act of Congress' to issue 'all writs necessary or appropriate in aid of their respective jurisdictions.'" *Id.* at 911 (quoting 28 U.S.C. § 1651(a)).

"'A writ of error *coram nobis* is an extraordinary remedy' typically granted only when a prisoner is out of custody and so cannot pursue habeas relief." *Doe v. United States*, 915 F.3d 905, 909 (2d Cir. 2019) (quoting *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014)). "*Coram nobis* is 'not a substitute for appeal, and relief under the writ is strictly limited to those cases in which errors of the most fundamental character have rendered the proceeding itself irregular and invalid.'" *United States v. Mandanici*, 205 F.3d 519, 524 (2d Cir. 2000) (quoting *Foont v. United States*, 93 F.3d 76, 78 (2d Cir. 1996)).

"To receive *coram nobis* relief, a petitioner must show 'that 1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate relief, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ.'" *Doe*, 915 F.3d at 910 (quoting *Kovacs*, 744 F.3d at 49). "The

proceedings leading to the petitioner's conviction are presumed to be correct, and "the burden rests on the accused to show otherwise." *Foont*, 93 F.3d at 78–79 (quoting *United States v. Morgan*, 346 U.S. 502, 512 (1954)). Thus, "the bar for succeeding on such a writ is a high one, first because great respect is placed upon the finality of judgments, . . . and second, because 'a court must presume that the proceedings were correct, and the burden of showing rests on the petitioner.'" *United States v. Hernandez*, 283 F. Supp. 3d 144, 149 (S.D.N.Y. 2018) (quoting *Fleming v. United States*, 146 F.3d 88, 90 (2d Cir. 1998)).

### V.  DISCUSSION

#### A.  Timeliness of *Coram Nobis* Petition

Ms. Shen's Petition is untimely. A petition for a writ of error *coram nobis* is not governed by any statute of limitations. *See Foont*, 93 F.3d at 79. "However, an error of constitutional dimension at the time of plea or sentence renders a conviction voidable, not void, and coram nobis relief may be barred by the passage of time." *Id.* In order "[t]o receive *coram nobis* relief, a petitioner must show 'that . . . sound reasons exist for failure to seek appropriate relief.'" *Doe*, 915 F.3d at 910 (quoting *Kovacs*, 744 F.3d at 49). The Second Circuit has interpreted the requirement that a petitioner show "sound reasons" for delay in filing a petition "as calling to the attention of the district court the circumstances surrounding the petitioner's failure to raise the issue earlier rather than the government's injury that resulted from the delay." *Foont*, 93 F.3d at 80. "The critical inquiry, then, is whether the petitioner is able to show justifiable reasons for the delay." *Id.* "A district court considering the timeliness of a petition for a writ of error coram nobis must decide the issue in light of the circumstances of the individual case." *Id.* at 79.

Ms. Shen has not demonstrated sound reasons for her delay in raising the asserted deficiency in Mr. Schioppi's performance. Mr. Schioppi advised Ms. Shen before her plea that her conviction would have adverse immigration consequences that could include deportation. During Ms. Shen's

change of plea proceeding in April 2006, Magistrate Judge Pitman also advised her that her plea could have adverse immigration consequences.  Ms. Shen expressed concern about possible deportation during her sentencing hearing in June 2006.  According to Ms. Shen's own account of events, she knew immediately after her sentencing that she could be deported as a result of the conviction.  She testified that her lawyer told her at that time that she might be immediately detained by immigration authorities.

Ms. Shen was aware in 2006 that her conviction would have adverse immigration effects that could include deportation.  The Court does not credit Ms. Shen's assertion that she realized only recently that her conviction could have an adverse impact on her immigration status.  Ms. Shen proffers no other reason for her extended delay.  She has not demonstrated that her Petition is timely.  A 16-year gap without a competent explanation is simply too long.  *See Dorfmann v. United States*, No. 13 Civ. 4999 JCF, 2014 WL 260583, at 6 (S.D.N.Y. Jan. 23, 2014) (finding *coram nobis* petition untimely where petitioner "waited more than three years to file the petition"); *Rodriguez v. United States*, No. 98 Cr. 00764 MHD, 2012 WL 6082477, at *10 (S.D.N.Y. Dec. 4, 2012) (finding two-year delay untimely).

### B.    Ineffective Assistance of Counsel

Ms. Shen has not demonstrated that her counsel's representation was objectively unreasonable.  "'Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process.'"  *Kovacs*, 744 F.3d at 49 (quoting *Lafler v. Cooper*, 566 U.S. 156, 162 (2012)).  Therefore, "ineffective assistance of counsel is one ground for granting a writ of *coram nobis*."  *Id.*  "A claim of ineffective assistance entails a showing that:  1) the defense counsel's performance was objectively unreasonable; and 2) the deficient performance prejudiced the defense."  *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)).

Mr. Schioppi's representation of Ms. Shen was not objectively unreasonable under the legal standard that applied at the time of her plea. As the Court wrote in the August Opinion, the categorical rule announced by the Supreme Court in *Padilla v. Kentucky* does not apply in this case. In *Padilla*, the Court concluded that "counsel must advise her client regarding the risk of deportation." 559 U.S. at 367. However, in *Chaidez v. United States*, the Supreme Court held that *Padilla*'s holding did not apply retroactively. 568 U.S. 342, 344 (2013). Because Ms. Shen pleaded guilty before *Padilla*, the Court must look to the law in effect at the time of the plea to evaluate whether Mr. Schioppi's performance was objectively unreasonable.

The applicable legal standard at the time of Ms. Shen's plea was articulated in *United States v. Couto*, 311 F.3d 179 (2d Cir. 2002). In *Couto*, the Second Circuit noted that it had held that "an attorney's failure to inform a client of the deportation consequences of a guilty plea, without more, does not fall below an objective standard of reasonableness." *Id.* at 187. The court of appeals held that an "affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is today objectively unreasonable" and "meets the first prong of the *Strickland* test" for ineffective assistance of counsel." *Id.* at 188. The court held that because "an alien convicted of an aggravated felony is automatically subject to removal and no one—not the judge, the [immigration agency], nor even the United States Attorney General—has any discretion to stop the deportation," ambiguous statements by counsel such as "there were many things that could be done to prevent [an aggravated felon] from being deported" constituted an affirmative misrepresentation that would permit a finding that counsel's performance was objectively unreasonable. *Id.* at 183, 191.

Ms. Shen has not demonstrated that Mr. Schioppi's advice fell below the standard articulated in *Couto*. Mr. Schioppi did not make an affirmative misrepresentation or an ambiguous statement to Ms. Shen. He did not suggest to her that she could expect to remain in the United States following her plea. He did not tell her that there were things that could be done that would permit her to

remain in the country.  To the contrary, he communicated that she could be deported as a result of her conviction.  Mr. Schioppi failed to advise Ms. Shen that her conviction for an "aggravated felony" mandated her deportation under federal law.  After *Padilla*, his failure to do so would have been objectively unreasonable.  But it was not objectionably unreasonable under the law in effect at the time of Ms. Shen's plea given the circumstances of her case.[6]

## VI.    CONCLUSION

The bar for succeeding on a writ of *coram nobis* is a high one.  Ms. Shen has not met the test here, in large part because the Court does not credit her account of the facts upon which her Petition is predicated.  As a result, Ms. Shen's Petition is DENIED.

The Clerk of Court is directed to enter judgment for the United States, to terminate all pending motions, and to close case 1:22-cv-8014.

SO ORDERED.

Dated:  April 25, 2024
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

[6] Despite the statute's mandate that Ms. Shen be deported as a result of her "aggravated felony," she has not been deported in the nearly two decades since her plea.  The instigation for the Petition was the potential denial of Ms. Shen's request for asylum, not an imminent attempt to deport her.  In light of the circumstances of this case, which involved the young mother of a United States citizen who sold counterfeit bags, it was not unreasonable under the circumstances for Mr. Schioppi to decide to advise his client that she "could" be deported as a result of her conviction, rather than that she "would" be deported.  As the Government proffered during oral argument, the United States has limited resources with which to implement the law and a degree of discretion to enforce it.  Given that, it would be objectively reasonable for Mr. Schioppi to understand that Ms. Shen was unlikely to be a high-priority target for deportation.  Mr. Schioppi's guidance that deportation was possible, but not certain, in her case was reasonable advice regarding her particular position based on the circumstances of her case at the time.  *See Michel v. United States*, 507 F.2d 461, 465 (2d Cir. 1974).  Arguably, the fact that Ms. Shen has remained in the United States for almost two decades since her conviction, notwithstanding the statutory mandate for her deportation, confirms the reasonableness of the advice at the time given the circumstances of her case.